## HILER AUDIO CORPORATION v. GENERAL RADIO CO.

District Court, D. Massachusetts. May 23, 1928.

No. 2787.

1. Patents ⬤�netstwtish26(2)—Combination of old elements into new association is patentable, if new and beneficial result is produced.

Combination of old elements into new association is proper subject for patent, where the combination produces new results, or old results in a new way, so as to produce a useful and effective device.

2. Patents ⬤⟶328—1,589,692, for improving choke coil amplification unit on radio signal amplifying circuits, held valid.

Hiler patent, No. 1,589,692, for an improved construction of a choke coil amplification unit for use on radio signal amplifying circuits, held valid, as containing patentable novelty.

3. Patents ⬤⟶226—In determining infringement, court considers whether alleged infringing device performs substantially identical functions as patented device, in substantially same way, to obtain same result.

In determining question of infringement, court must look at the particular devices or elements in the light of their functions, and ascertain whether device performs substantially identical functions of patented devise, in substantially the same way, to obtain the same result.

4. Patents ⬤⟶243(1)—Separation of integral elements of device does not avoid infringement, if function and operation are substantially identical with prior patented device.

Infringement is not avoided by the fact that one integral element of the device is separated into two or more distinct parts, so long as the function and operation remain substantially the same as prior patented device.

5. Patents ⬤⟶328—1,589,692, for improving choke coil amplification unit on radio signal amplifying circuits, held infringed.

Hiler patent, No. 1,589,692, for an improved construction of a choke coil amplification unit for use on radio signal amplifying circuits, held infringed.

In Equity. Patent infringement suit by the Hiler Audio Corporation against the General Radio Company. Decree for plaintiff.

Marcus B. May and Herbert A. Baker, both of Boston, Mass., for plaintiff.

George K. Woodworth and Frederick A. Tennant, both of Boston, Mass., for defendant.

BREWSTER, District Judge. This is an infringement suit, brought upon letters patent of the United States No. 1,589,692, for an improved construction of a choke coil amplification unit for use on radio signal amplifying circuits.

The patent was granted to Edward E. Hiler June 22, 1926, on his application filed August 27, 1925, which, for the purposes of this case, may be taken to be the date of the invention. The title to the patent is admitted to be in the plaintiff. Claims 7 to 10, inclusive, are the only claims involved.

The patent relates to a unitary device, which may be used by manufacturers or amateurs in the audio stages of a radio receiving set. It is especially adapted to provide an impedance coupling unit for connecting together or coupling successive audio amplifier vacuum tubes in the audio amplifying stages of the receiving set.

Prior to the patent in suit, there were several well-known types of audio amplifier coupling circuits, which might be broadly classified as (1) transformer coupling circuit; (2) resistance coupling circuit; and (3) the choke coil impedance circuit.

This third type of coupling circuit originally consisted of a combination of choke coil impedance, coupling condenser, and a high resistance, the latter serving as a grid leak.

Later a choke coil impedance circuit, which Mr. Hiler claims to have independently originated in 1920, comprised two choke

coils and a condenser connected between the plate of one tube and the grid of a succeeding tube. This type of coupling circuit possessed advantages over the other types, in that louder signals could be amplified without distortion, and the amplification obtained could be maintained uniform over substantially the entire range of audio frequencies. But three stages were required to obtain the same degree of amplification that would be produced in two stages of the transformer coupled circuit.

Mr. Hiler attempted to interest manufacturers of receiving sets in the adoption and use of his double choke coil coupling circuit which then called for two separate choke coils. But his endeavors were not attended with success, because of the cost and difficulties of incorporating the two coils and the condenser into the receiving set. There were other objectionable features, which developed when used in highly sensitive receivers, such as the neutrodyne.

In endeavoring to solve the problems presented, Mr. Hiler, as a result of experimentations, conceived a device whereby a simple, compact, and inexpensive unit was produced, capable of being easily connected in audio amplifying stages by amateurs, as well as by manufacturers, and which eliminated independent electrical devices without impairing the functional efficiency of the coupling circuit.

The device consists of plate and grid choke coils and coupling condenser, compactly grouped and inclosed within a casing, or can, having external binding posts which indicated proper connections between the amplifying tubes.

This unitary device is the subject-matter of the patent in suit. The double impedance circuit which Mr. Hiler worked out was found to have been anticipated in prior patents and publications. Though the alleged discovery relates to a highly technical art, involving scientific principles and theories that only the trained expert can fully comprehend, the patented device in itself is fairly simple, its functions easily understood, and the issues of fact here presented are comparatively free from complications. The questions raised are to be decided upon general and familiar principles of law applicable to any patent involving a new combination of old elements, for the plaintiff concedes that the patent is for a combination of elements, all old in the art.

The elements common to the four claims involved are these: (1) An inclosing casing; (2) four external circuit connections; i. e.,

battery, plate, filament, and grid; (3) a pair of choke coils, one electrically connected between the battery and plate connections, and the other between the filament and grid connections; (4) a laminate core, upon which said coils are mounted in side by side relation; (5) means in the said core to provide a magnetic shield intermediate said coils.

The eighth claim adds a filler compound in said casing, in which the coils and core are imbedded. The ninth claim adds a condenser element, also inclosed within the casing and electrically connected between said plate and grid connections.

The tenth claim embraces all of the above elements, and, for the purposes of this case, is sufficiently illustrative. It reads as follows:

"A unitary device of the kind described, comprising an inclosing casing having external circuit connections consisting of a battery connection, a plate connection, a filament connection, and a grid connection; a pair of choke coils within said casing, one of said coils being electrically connected between said battery and plate connections, and the other of said coils being electrically connected between the filament and grid connections; a laminate core, upon which said coils are mounted in side by side relation, said core having means to provide a magnetic shield intermediate said coils; a condenser element, also inclosed within said casing and electrically connected between said plate and grid connections; and a filler compound in said casing, in which said coils and core and said condenser element are imbedded."

The defendant assails the validity of the patent on the principal ground that no patentable novelty is disclosed; in other words, that the patent is for an unpatentable aggregation of well-known elements. Another minor objection is that the patent is not sufficiently definite.

A great deal of evidence was offered by defendant bearing upon the art as it existed when Hiler entered it with his patent. Transformers and other electrical apparatus had been inclosed in casings for their protection, and the terminals had been brought to suitably marked binding posts outside the casing.

Earlier patents, publications, and textbooks, introduced in evidence by the defendant, fully established the fact that before plaintiff's patentee entered the art various circuits having transformer coupling between the audio stages, or resistance coupling with induction leaks, or inductance coupling with resistance leaks, had been discovered, dis-

closed, and used as means of audio amplification. The defendant offered in evidence several devices that had been manufactured, sold, or publicly used prior to plaintiff's invention. The first of these to be mentioned is an amplifying device made by the General Electric Company for the United States Navy. The device was called a "modulation amplifier," and was designed to function so as to couple a microphone transformer with a modulator tube. It consisted of an amplifying tube with an associated ballast lamp, two coils and condensers corresponding to those in the plaintiff's patented device, all mounted on a supporting frame within a cabinet, which had ventilating holes and doors to give access to its interior for lamp and tube replacement. It was not adapted to be used, and could not be used, in a radio receiving set. The two choke coils happened to be arranged side by side, but since the device was for use only in connection with transmitting from aircraft, or in other words with a radio telephone transmitter, there was no especial occasion for preventing mutual inductance between the coils, and there is nothing to indicate that the arrangement was deliberately made for the purpose of preventing such inductance.

The other device was made by the defendant in 1923, and was described by the assignees as a "double impedance unit." It consisted of a small input coil and two large coils, connected in parallel forming the output coil. The condenser was a separate unit, which had to be connected from the outside. There were binding post terminals, connecting to filament, grid, and plate. This device was essentially a transformer.

There were also in evidence patented devices put out by the Radio Corporation of America, known as "reactors," which consisted of a coil wound around a metallic core and operating as an impedance. These devices were brought into the case for the purpose of showing the state of the art when the plaintiff's patentee entered with his discovery.

All of these devices were intended for use in transmitting apparatus, and could not be used in radio receiving sets. Defendant's counsel has asserted that the plaintiff's device was not limited to wireless telephoning, but is equally adapted to telegraphy, and upon that assertion bases the argument that these prior devices materially limit the art into which the patentee entered. It may be that this assertion is not open to criticism, but it is difficult for me to see how the plaintiff's device could be used in transmitting, or in wireless telegraphy, without undergoing important modifications. However that may be, it is clear from the language of the specifications that Mr. Hiler did not have the ambition that the defendant's counsel now ascribes to him, for he says at the close of his specifications:

"From the above description it will be evident that a very complete and compact choke coil unit, suitable for connection in radio receiving circuits, and which is capable of independent manufacture and sale as an accessory, is provided."

It is reasonably clear from the evidence that Hiler was the first to assemble, in a simple, compact, and inexpensive unitary device, a plate and a grid choke coil and a coupling condenser, grouped in proper relations within a casing having external binding posts indicated for proper connection between two amplifying tubes.

The real question which has to be determined from this mass of highly technical evidence adduced by the defendant is whether Hiler invented something when he assembled his patented choke coil amplification unit. The argument advanced by the defendant is that it did not involve the exercise of inventive genius to take, for example, two of the reactors built by the Radio Corporation of America, place them in a can with a condenser, and provide connections for terminals with the proper binding posts.

It is also claimed that it did not involve the exercise of the inventive faculties to take the coils, cores, and condensers from the Navy device, manufactured by the General Electric Company, and likewise place them in a can, or container, filled with a semiplastic substance, with suitable connecting binding posts.

[1] Of course, it must be conceded that what he did was merely to bring old, well-known elements into a new association. If it produced new results, or old results in a new way, the invention was properly a subject for a patent. As I stated in Lenk v. Hunt-Lasher Co. (D. C.) 14 F.(2d) 335, 339: "There is authority which has persuasive force in support of the proposition that, when one has selected well-known elements from the prior art and has so combined them as to produce a new and beneficial result, such as a more useful and more effective device, he has exercised more than ordinary mechanical skill, and his work merits the protection of our patent laws."

I also derive assistance from the learned opinion of Judge Lowell in Submarine Signal Corp. v. General Radio Co. (D. C.) 14

F.(2d) 178, 181, wherein he points out that the "true test of invention is the novelty of the result, and that this result must be criticized by comparing it with the machines, processes, or methods, known before. The test is an objective one. If the result of an idea is a machine or process involving a new function, or an old function arrived at by new means, the embodiment of the idea is patentable." .

[2] Applying these tests, I think it must be found that Hiler did produce a novel result, something that had not been known, and which filled an obvious need. While he did not make a great discovery, he did contribute something to the art—enough, in my opinion, to entitle the plaintiff to the protection of the patent laws. See, also, Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 S. Ct. 698, 46 L. Ed. 968; Webster Loom Co. v. Higgins,.105 U. S. 580, 26 L. Ed. 1177;. Eibel Process Co. v. M. & O. Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523.

The file wrapper shows that the Patent Office issued the patent without question. In addition to the presumption of validity which attaches to the action of the Patent Office, the plaintiff has whatever benefit may legally accrue to it by reason of the fact that its choke coil amplification unit received a very prompt and cordial reception in the trade. See Temco Electric Motor Co. v. Apco Mfg. Co., 275 U. S. 319, 48 S. Ct. 170, 72 L. Ed. ——. Manufacturers of receiving sets and manufacturers of radio accessories have, in substantial and increasing .quantities, manufactured and sold under license granted by the plaintiff. The practical value and utility of the patented article have been clearly demonstrated. The course pursued by the defendant affords some evidence of this. The unimpeachable evidence is that the inventor opened negotiations with the defendant, with a view of inducing the defendant to manufacture the device under a license, and he fully disclosed to the defendant's engineers the nature and advantages of the double choke coil coupling unit. He furnished the defendant coils for tests. Some two months later he was informed by the defendant's representatives that it was not interested, and shortly thereafter the defendant advertised and started to manufacture the infringing unit, which, as will presently be seen, contains all the essential elements of the plaintiff's device, brought together in the same association and performing the same functions in substantially the same manner. In its advertisement it would have the public believe that the infringing device is unique in design and performance. It also, in its advertisements which it circulated, enlarged upon the advantages of the infringing device. These advantages were substantially the same as those mentioned by Hiler in his application. Such imitation ought to be given weight as evidence of what the defendant thinks of the patent, and persuasive of "what the rest of the world ought to think." Kurtz v. Belle Hat Lining Co. (C. C. A.) 280 F. 277, 281.

I will next consider the defendant's suggestion that the patent ought not to be sustained because the claims are indefinite. This suggestion deals with the language of the claim used to describe the element referred to as a "means for providing a magnetic shield." The criticism of this phraseology is that the word "shield" is inaccurate as a technical term, when used to describe the functions of the portion of the laminate core which is disposed intermediate the two coils.

After hearing the explanation of the several witnesses, I might agree with the defendant's counsel that the word "shunt" would have been more appropriate; but we are dealing with a product of manufacture, and, from a reading of the specifications, one skilled in the art would have no difficulty in determining what was meant by the words "means to provide a magnetic shield."

The specifications clearly indicate that the intermediate laminate iron portion forms a "proper magnetic circuit for each. coil" (specifications, page 1, line 87), thus assuring ·a "complete magnetic path throughout the body of the core, without interruptions or internal· air gaps" specifications, page 2, line 6).

To my mind, it would seem reasonable to say that, if the laminate iron arm between the coils operated to divert or "shunt" magnetic forces emanating from one coil, to the same extent it would shield the other coil. The word "shield" may not have been the most exact term to employ, but it is not wholly inappropriate, and it clearly would furnish no grounds for declaring the patent invalid, nor do I think the court would be usurping the function of the Patent Office by reading the word "shield" to mean "shunt" in this particular instance. See Rajah Auto Supply Co. v. Belvidere Screw & Machine Co. (C. C. A.) 275 F. 761; Reece Button-Hole Machine Co. v. Globe Button-Hole Machine Co. (C. C. A.) 61 F. 958; Victory Belt Co. v. Marshall Field & Co. (C. C. A.) 300 F. 67.

I hold, therefore, that the plaintiff's patent is valid. The only question remaining is whether it is infringed. On this question it appears that the defendant is manufacturing and selling as a double impedance coupler a unitary device, consisting of a casing, or can, somewhat similar in appearance to that shown in plaintiff's patent. The casing has four external circuit connections, namely, battery, plate, filament, and grid. In the casing are compactly assembled a pair of choke coils, one electrically connected between the battery and plate connection and the other between the filament and grid connection; two laminate cores upon which the choke coils are mounted, and which, when placed in the can, mutually abut; a condenser element and a filler compound, in which the coils, core, and condenser are imbedded. This is the alleged infringing article made and sold by defendant when this suit was brought.

Since the suit was begun, the defendant has modified slightly the arrangement of the two coils and cores in the can. As now assembled, the cores are placed one on top of the other, in such a manner that the axis of the lower coil is vertical and the axis of the upper coil horizontal.

The defendant seeks to avoid the charge of infringement by differentiating its device from plaintiff's in these respects, viz. while both used laminate iron cores in the shape of a figure 8, the plaintiff uses only one core and winds around each end portion thereof one of the coils, so that the center arm, or portion, is intermediate the two coils. The defendant employs two cores, and winds a coil around the center arm of each laminate core.

The defendant's claim, as I gather it, is that the plaintiff's patent must be limited to a single laminate core, and cannot be construed to cover a device which comprises two cores; and, secondly, that the defendant's device does not embody any element corresponding to that described in plaintiff's patent as the means to provide a magnetic shield.

[3] Whether modifications of a patented device are sufficient to enable the defendant to escape the charge of infringement is a question that is frequently determined by the application of familiar tests which the courts have long recognized. The first of these is that stated by Mr. Justice Clifford in Union Paper Bag Machine Co. v. Murphy, 97 U. S. 120, 125 (24 L. Ed. 935):

"In determining the question of infringement, the court or jury, as the case may be, are not to judge about similarities or differences by the names of things, but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions or in a different way, or produce a substantially different result."

[4] Another rule, which may be gathered from the cases, is that infringement is not avoided by the fact that one of the integral elements of the device is separated into two or more distinct parts, so long as the function and operation remain substantially the same. Barber v. Otis Motor Sales Co. (C. C. A.) 240 F. 723; Kings County Raisin & Fruit Co. v. U. S. Consol. S. R. Co. (C. C. A.) 182 F. 59; Line Material Co. v. Brady Elec. Mfg. Co. (C. C. A.) 7 F.(2d) 48; Simplex Piston Ring Co. of America, Inc., v. Hamilton (D. C.) 21 F.(2d) 196; Pedersen v. Dundon (C. C. A.) 220 F. 309.

When the two laminate cores of the defendant's device are in position, the coils are brought into a side by side relation, and the portions of the laminate cores between the two coils operate as a shield, or shunt, performing precisely the same function in the same way as the iron arm between the two coils of the plaintiff's device. The only material change that has been wrought by the defendant in thus placing together, mutually abutting, the two laminate cores, is to divide the intermediate iron portion or the shielding means into two parts. Both the patentee and plaintiff's expert testified that the fact that the core in defendant's device is made in two parts is immaterial. It had no appreciable effect on the operation. The result of tests made by defendant's expert tended to bear out this statement.

[5] If we apply the rules above noted, it is plain that the defendant has not, by adopting this modification, brought his device outside of the scope of plaintiff's monopoly. Notwithstanding the slight mechanical difference in construction, the two devices perform the same function in the same way, and accomplish substantially identical results. The two cores in the defendant's impedance coupler are the mechanical equivalents of the single core in plaintiff's unit.

Nor do I think that the defendant has

sustained his contention that the device did not embody means to provide a magnetic shield. The testimony shows that the iron portion of the core structure between the coils of the defendant's unit functions as a magnetic path or magnetic circuit, to divert the magnetic lines of force emanating from the coils, and thereby provides a path of low reluctance, preventing interlinkage with the turns of the juxtaposed coils. We have, therefore, the element in the defendant's device which corresponds to the plaintiff's means to provide a magnetic shield intermediate said coils. The changes in manner of assembling the two cores and coils, adopted since the beginning of the suit, do not, in my opinion, affect the results. There was evidence tending to show that the new arrangement reduced the magnetic coupling between the two coils, and to that extent an improvement was made upon the plaintiff's device; but as Chief Justice Taft points out in Temco Elec. Motor Co. v. Apco Mfg. Co., supra (48 S. Ct. 170) at page —— (72 L. Ed.): "It is well established that an improver cannot appropriate the basic patent of another, and that the improver without a license is an infringer, and may be sued as such."

The defendant's double impedance coupler made before the suit and those made after the suit embody all of the elements of the plaintiff's combination, and bring together these elements in the same association, resulting in a unitary, compact, double impedance device, which can be easily and readily incorporated in a radio receiving set in the same manner and with the same facility as the plaintiff's device.

In conclusion, I find and rule that the plaintiff's patent is valid and infringed.